**DERBY INDUSTRIES, INC, Plaintiff,**

v.

**CHESTNUT RIDGE FOAM, INC., Defendant.**

**Civil No. 3:02cv0021AS.**

United States District Court,
N.D. Indiana,
South Bend Division.

April 10, 2002.

Thomas M. Dixon, South Bend, IN, Barry A. Macey, Indianapolis, IN, for Plaintiff.

Jospeh R. Fullenkamp, Timothy J. Maher, South Bend, IN, Robert M. Linn, Brian T. Licastro, Pittsburgh, PA, William T. Hopkins, Jr., Karen A. Festa, Shaun E. Graham, Maci M. Doden, Fort Wayne, IN, for Defendant.

## MEMORANDUM AND ORDER

ALLEN SHARP, District Judge.

### I. BACKGROUND

Derby Industries ("Derby") and Chestnut Ridge Foam ("Chestnut") are competitors in the highly specialized business of prison mattress production and sales. Derby contends Chestnut, in its quest to increase their sales among the various purchasers of prison mattresses, has engaged in a campaign of false and misleading ad-

vertising through the production of an amateur sales videotape. Derby alleges further that: 1) Chestnut has disseminated this videotape to various potential customers; 2) the false and misleading statements in the videotape have caused consumer confusion and are likely to cause further confusion.

The relevant events to Derby's claim center around the production of the videotape by Chestnut on October 22, 2001. At that time, Chestnut conducted a mattress flammability demonstration at the request of an existing customer, Georgia Correctional Industries. During that demonstration, Chestnut performed what it terms as the "Michigan Rollup Test" ("MRT") on three different brands of mattresses sold primarily to correctional facilities for use by prisoners. The three brands included: a Chestnut mattress; a Derby mattress; and an unidentified generic mattress.

According to Chestnut, each of the three mattresses were wrapped tightly around a nine-inch stovepipe and secured with a wire mesh. (Affidavit of McManamy, ¶¶ 8, 12). The stovepipe was then removed, and each mattress was placed upright on a three-inch block of CR SAFEGUARD foam at the same angle so that air could enter at the bottom of the mattress coil. (Affidavit of McManamy, ¶ 12). Eight pieces of newspaper were then placed in the center of each rolled mattress and then set afire. (Id.). The rolled mattresses were ignited within seconds of each other. (Preliminary Injunction Hearing Transcript at p. 76,96). Chestnut contends that the video demonstrated that its mattress performed better than both the generic mattress and Derby's mattress. (See Videotape, Ex. A. to Compl.).

Subsequently, Chestnut obtained a copy of the videotape of the demonstration and sent copies to seven identifiable entities. (Affidavit of McManamy, ¶ 13). Two of these entities are current customers of Chestnut and had been for many years prior to the making of the video. (Affidavit of McManamy, ¶ 12(f)-(g)). Chestnut has averred that none of the other five entities have purchased any mattresses since receiving a copy of the videotape. (Affidavit of McManamy, ¶ 13(a)-(e)). Furthermore, Chestnut has no future plans to disseminate the videotape to any other potential purchasers. (Affidavit of McManamy at ¶ 15).

At some point after the making of the videotape, one of Derby's customers received and viewed the videotape produced by Chestnut. (See Preliminary Injunction Hearing Tr. at pp. 113–14). According to a Chestnut employee, Nancy Hebner, that customer expressed confusion concerning the statements made in the videotape and whether Derby's mattresses met industry standards. (See Id. at pp. 113–14). Thereafter, on January 9, 2002, Derby filed its complaint alleging violations of Sections 43(a)(1)(A) and 43(a)(1)(B) of the Lanham Act, as well as a tortious interference with a business relationship claim.[1] Derby has requested that this court grant a preliminary injunction: (i) enjoining Chestnut from further dissemination of the videotape; (ii) enjoining it from using any advertising referring to the demonstration method; and (iii) compelling it to recall any materials referring to the demonstration method. On January 23, 2002, a hearing on Derby's motion for preliminary injunction was held in Lafayette, Indiana. Both parties submitted post hearing briefs on the matter and the matter is now fully

---

1. Derby has not addressed or attempted to demonstrate a likelihood of success on the merits of a tortious interference claim nor a Section 43(a)(1)(A) Lanham Act claim. Therefore, the court's opinion will focus solely upon Derby's claim under Section 43(a)(1)(B) of the Lanham Act.

briefed. For the following reasons Derby's motion for preliminary injunction is now **DENIED.**

## II. STANDARD OF REVIEW

■ A party seeking a preliminary injunction must first demonstrate the following:

1) some likelihood of succeeding on the merits, and 2) that it has "no adequate remedy at law" and will suffer "irreparable harm" if preliminary relief is denied. *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11, (7th Cir.1992)

This preliminary showing must be made before moving on to the next two-part showing. *Id.* at 11. If those thresholds have been met the court must then consider:

3) the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied and 4) the public interest, meaning the consequences of granting or denying the injunction to non-parties. *Id.* at 11.

The court must evaluate the underlying merits of the plaintiff's case in order to determine which side the irreparable harm should more heavily weigh, the defendant's or the plaintiff's. *Abbott Laboratories,* at 12.

## III. DISCUSSION

Given the above standard in determining whether a preliminary injunction should be issued, the court now turns to an analysis of the likelihood of success on the merits of Derby's claims.

**2.** Section 43(a)(1) provides in part:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

### A. Applicable framework under the Lanham Act

■ Section 43(a) of the Lanham Act prohibits any person from using "any false description or representation" in advertising. *BASF Corp. v. Old World Trading Co., Inc.*, 41 F.3d 1081, 1088 (7th Cir. 1994).[2] The following five elements must be established by the plaintiff in order to make out a claim for false or deceptive advertising on the part of the defendant: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products. *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir.1999); see also *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 168 F.3d 967, 971 (7th Cir.1999). Additionally, in order to recover monetary damages under the Lanham Act, "a plaintiff must prove both actual damages and a causal link between defendant's violation and those damages." *Hot Wax* at 820.

■ A false statement giving rise to a Lanham Act violation can be established by one of two different ways. First, a plaintiff can show that the commercial claims are literally false as a factual mat-

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C. §.1125(a)

ter. See *Hot Wax, Inc.* at 820. Second, a plaintiff can demonstrate that the claims while literally true or ambiguous; convey a false impression, are misleading in context, or likely to deceive consumers. *Id.* A plaintiff need not show that the statement either actually deceived customers or was likely to deceive under the first method. *Id.* (See Element 2 above). However, to be successful under the second method, the plaintiff must prove that the statement caused actual consumer confusion. *Id.* at 820 citing *B. Sanfield, Inc.* at 971–72. With these applicable principles in mind, the court now turns to the claims presented by the plaintiff in this case.

**B. Likelihood of success on the underlying merits of the claim**

**1. Does the tape in question constitute advertising by the Defendant?**

Accordingly, for purposes of the Lanham Act's definition of "commercial advertising or promotion," both the required level of circulation and the relevant "consuming" or "purchasing" public addressed by the dissemination of false information will vary according to the specifics of the industry. *Seven–Up Co. v. Coca–Cola Co.*, 86 F.3d 1379, 1384 (5th Cir.1996). The prison mattress industry is a highly specialized market consisting of a considerably smaller number of end-users than a product that is used by the general consuming public such as anti-freeze, motor oil or even certain pharmaceutical drugs.

This circuit has recently addressed the issue of what types of commercial speech fall under the characterization of "commercial advertising or promotion." *First Health Group Corp. v. BCE Emergis Corp.*, 269 F.3d 800, 803–04, (7th Cir.2001). The panel in *First Health* noted that the language and structure of Section 43(a)(1)(B) suggests "a line between varieties of commercial speech." *Id.* at 803.

The appropriate inquiry then turns on whether the commercial speech is a form of promotion to various anonymous recipients or whether the speech is in the form of direct face-to face-communications, with the former constituting advertising and the latter not. *First Health Group Corp.* at 803. "In normal usage, an advertisement read by millions (or even thousands in a trade magazine) is advertising, while a person-to-person pitch by an account executive is not." *Id.* at 804. The necessary inquiry requires one to determine whether the video was used by Chestnut as promotional material used to entice various anonymous recipients to purchase its mattresses.

More specifically, whether a video produced by one of Chestnut's customers (the Georgia Correctional Facility) and later distributed by Chestnut to a small number of other potential customers constitutes advertising under Section 43 of the Lanham Act.

Here the videotape was admittedly distributed to seven different entities. (Affidavit of McManamy at ¶ 13, Hearing Transcript at p. 31). Five of the seven recipients were identified as potential customers that have not placed any orders for the Chestnut mattresses since receipt of the videotape. (Aff. at ¶ 13(a)-(e), Hearing Tr. at p. 93). The Seventh Circuit has described advertising as "a subset of persuasion and refers to dissemination of prefabricated promotional material." *Zurich Ins. Co. v. Amcor Sunclipse North America*, 241 F.3d 605, 607 (7th Cir.2001).

■■■ Chestnut argues that because Derby did not offer evidence of widespread distribution of the videotape it therefore failed to make a showing that the videotape constituted advertising. However, as Derby correctly points out where the potential purchasers in the market are relatively small in number a single promotion-

al presentation to an individual purchaser may be sufficient to invoke the protections of the Lanham Act. *Seven–Up Co. v. Coca–Cola Co.*, 86 F.3d 1379, 1386 (5th Cir.1996); (concluding that use of presentation materials during negotiations with eleven representatives did not constitute merely isolated, individual statements of opinion by a single sales representative to a single customer; rather materials fell within the meaning of "commercial advertising or promotion."); See also *Mobius Management Sys. Inc. v. Fourth Dimension Software, Inc.*, 880 F.Supp. 1005 (S.D.N.Y. 1994). Therefore given the admission by Chestnut that the videotape was distributed to potential customers the court finds that the tape constituted prefabricated promotional material intended for the purpose of generating sales and therefore constituted "commercial advertising" as provided under the Lanham Act.

## 2. Whether the videotape was literally false?

▇▇ Derby begins with the argument that the videotape and its representations therein are literally false because the Michigan Roll-up Test is not a test under the literal definition given that term by both the American Heritage Dictionary, 2nd College Edition and Webster's Collegiate Dictionary. This argument is a nonstarter. The evidence of record demonstrates that the MRT is a procedure that has been employed in the past by various persons to test the flammability of prison mattresses.[3] One has to look no further than the October 2001 Advance Notice of Proposed Rulemaking issued by the Consumer Product Safety Commission to ascertain that various forms of that procedure have been implemented in the past. See *Standard to Address Open Flame Ig-*

*nition of Mattresses/Bedding*, 66 Fed.Reg. 51,886 (October 11, 2001). Rather it appears, as demonstrated by the bulk of its remaining arguments and as will be seen in the discussion below, that Derby contests the validity and reliability of such a procedure and not whether it was in fact recognized by at least some individuals in the industry as a procedure to test the prison mattresses.

Next, Derby argues that the commercial claims made in the videotape are literally false in light of the fact that the MRT was not conducted using the appropriate procedures, guidelines or standards. Neither party has presented this court with any case law where a plaintiff took umbrage with the validity of a test relied upon by a defendant in making their alleged false commercial claims. Furthermore, the court has reviewed several of the cases where tests were used by a defendant to make certain commercial claims, but the success or failure of the plaintiff's case generally rested on whether those tests used supported the claims made in the advertising. See *BASF Corp. v. Old World Trading Co., Inc.*, 41 F.3d 1081, 1091 (7th Cir.1994)(Failure of Defendant to perform tests relied upon in claim resulted in claim being found to be literally false.); *Procter & Gamble Co. v. Chesebrough–Pond's Inc.*, 747 F.2d 114, 119 (2nd Cir.1984)(Plaintiff is required to prove that an advertisement is false and "not merely that it is unsubstantiated by acceptable tests or other proof"; parties claims failed, although the parties pointed to serious flaws in their opponents underlying data, because neither party proved that the other made false claims); *McNeil–P.C.C. v. Bristol–Myers Squibb Co.*, 938 F.2d 1544, 1549–50 (2d Cir.1991)(Plaintiff successful

---

**3.** The MRT has been conducted by major corporations, including Dupont. (Hearing Tr. at p. 39). The MRT has even been conducted by

one of Derby's own witnesses that testified during the preliminary injunction hearing. (Hearing Tr. p. 131).

on Lanham Act claim by showing that the studies could not establish the claim, but by showing that the same studies conclusively showed that the products were identical.). Here Derby has merely attempted to show that the claims made by Chestnut are false simply because it used an improper and outdated test and not because Chestnut did not actually perform the MRT, as in *BASF Corp.*, or that the results of the MRT did not reflect what was shown on the videotape (i.e. that Derby's mattresses was superior to Chestnut's) as in *McNeil–P.C.C.*

Derby's point of emphasis is that Chestnut failed to follow the appropriate procedures in performing the MRT. Herein lies the problem. Derby contends that the MRT is unreliable because it is an illegitimate procedure that consists of merely anecdotal protocols. (Hearing Tr. pp. 9–10). Chestnut counters this assertion by claiming that the MRT is simply a general procedure which can be performed in several different ways. (Hearing Tr. p. 88). In the October 11, 2001 memorandum issued by the Consumer Protection Commission, the Commission noted that the MRT was one of the existing tests or standards evaluated to test the flame hazards associated with mattresses. 66 Fed.Reg. 197 at 51887. Furthermore, the Commission noted that "these standards specify tests which are duplicates or modifications of each other." See Id. This statement leaves the court with the impression that it must agree with the testimony of Chestnut that there is no one way to perform flame tests on these particular mattresses. This is confirmed by the ASTM's document describing the MRT. (See ¶ 5.2 of ASTM F–1870). Rather, the various tests performed by companies in this industry are a combination of various flame tests. Derby does not specifically refute this assertion rather it simply states that the protocols were not followed specifically and there-

fore the specific test performed in the videotape was false and misleading.

Specifically, Derby takes aim at the fact that Chestnut proceeded to cut an "X" in each mattress before conducting the MRT and that the procedures do not provide for such a protocol. As pointed out by Chestnut, that is Derby's fundamental problem with the MRT to begin with; that the test is an illegitimate procedure with no way of giving accurate results because it is not uniformly performed. The court agrees with Chestnut's point that it is illogical for Derby then to argue that a literally false statement was made in the videotape because Chestnut failed to adhere to some set of alleged protocols that are merely anecdotal. (See D's brief at p. 8).

Additionally, Derby takes aim at other alleged deviations at the protocols employed by Chestnut in performing the MRT in the videotape, specifically that it was performed outside, the tapes are propped up on uneven ground with foam blocks. As stated above Chestnut has admitted that the MRT is subject to different protocols or methods in implementing the test. Furthermore, Derby has failed to make a showing how performing the MRT in the various altered forms leads to a false and misleading conclusion about the quality of the mattresses tested. Derby must come forward with evidence that demonstrates the unreliability of the MRT test as performed by Chestnut and then how that unreliability leads to a false and misleading conclusion given to the consuming market. At this point, Derby has simply contested the methods used and digressed into a long history of the MRT. Given the testimony that the MRT can be run in various modified forms, Derby has failed to demonstrate how the performance of the particular test performed by Chestnut in the videotape yielded an unreliable result; a result that would not allow one to

conclude with a "reasonable certainty that the tests established the proposition for which they were cited." See *Procter & Gamble v. Chesebrough–Pond's Inc.*, 747 F.2d 114, 119 (2nd Cir.1984).

Again the court is reminded that a plaintiff must demonstrate that the certain tests or procedures utilized in the advertising are not "sufficiently reliable" to support the advertised conclusion with "reasonable certainty." *Rhone–Poulenc Rorer Pharmaceuticals, Inc. v. Marion Merrell Dow, Inc.*, 93 F.3d 511, 515 (8th Cir.1996). The court of appeals for the Eighth Circuit went on to say that "to ensure vigorous competition and to protect legitimate commercial speech, courts applying this standard should give advertisers a fair amount of leeway, at least in the absence of a clear intent to deceive or substantial consumer confusion." *Id.* at 515. This Derby has not done. Given the unrefuted testimony that the MRT can be performed under varying conditions, the court finds that Chestnut, in performing its version of the MRT, did not make any false or misleading claims.

As suggested by the Seventh Circuit in *First Health Group Corp.*, Derby should have engaged in an aggressive advertising campaign if it felt that the representations made by Chestnut were not reflective of the true superior quality of the two mattresses instead of seeking to utilize the legal system to combat the crude videotape produced by Chestnut. See *First Health Group Corp.*, 269 F.3d at 805 ("First Health should have turned to an advertising agency, not to a court, in search of a response to its business rivals."). Derby need only look to two statements made in its brief to begin that campaign assuming that these statements are in fact true: 1) "The Michigan Roll-up Test was abandoned by both the bedding industry and its regulatory bodies more than two decades ago, and there is no

scientific literature to suggest it has been recognized as a valid test method." (Statement of Undisputed Material Facts at ¶ 2); 2) In fire tests that are recognized by the industry, ASTM 1590E, NFPA 267 and Life Safety Code 101, the Derby mattress performed better than the Chestnut Ridge mattress. (Statement of Undisputed Material Facts at ¶ 6). Utilizing these statements, Derby could begin an advertising campaign that would more adequately address the problems than any legal remedy. More importantly, such a campaign would most likely be more successful and with more profitable results. Finally, the determination of which procedures should be followed in performing various tests is not a job that should be entrusted to a judge or a jury but rather certain safety committees and regulatory agencies that are better informed and more experienced. See *First Health Group Corp.*, 269 F.3d at 806. Therefore based upon the submission of the evidence by Derby at this time, the court finds that it is unlikely that Derby will be successful on the underlying merits of its claim.

**3. Does the tape contain any statements that are literally true but are misleading in context?**

██ Derby also argues that even if the court accepts the proposition that the statements made by Chestnut are literally true, the statements are misleading in context. Under the Lanham Act a plaintiff can bring a successful claim if he is able to demonstrate that the claims, while literally true or ambiguous, convey a false impression, are misleading in context, or likely to deceive consumers. See *Hot Wax, Inc.* at 820. Under this scenario, the plaintiff must prove that the statement caused actual consumer confusion. *Id.* at 820 citing *B. Sanfield, Inc.* at 971–72. Much of the discussion in the above section applies with equal force to Derby's claim that despite

the statements literally truth, they are nevertheless misleading in context.

Under this scenario, Derby is required to show that actual customer confusion occurred. Derby attempts to establish the required customer confusion through the affidavit of one of its employees, Nancy Hebner, that a Derby customer expressed "confusion" after watching the videotape. (Hearing Tr. at pp. 113–14). Despite the apparent evidentiary problems with this affidavit, Hebner has failed to identify with particularity what parts of the videotape were confusing to the customer. Significantly, the videotape noted that all three mattresses passed the industry standards for flammability.[4] (Video Tr. at p. 2). More importantly, Derby has come forward with only one instance of customer confusion and that confusion was not substantial enough for Derby to lose their business. (Hearing Tr. at p. 118). See *Sanfield,* 168 F.3d at 971. Put simply, Derby has failed to make the requisite showing that a substantial segment of the target audience was misled or deceived as a result of the statements in the videotape. *Id.*

Given the above discussion concerning the history and implementation of the MRT, the uncertain nature of the customer confusion and Derby's ability to pursue more effective means for combating Chestnuts's exercise of commercial speech, the court finds that the claim of literal truth but misleading in context or likely to deceive claim to be without merit based upon the evidence submitted at this point in time.

### 4. Materiality element.

■ Even assuming that Derby could demonstrate that the MRT test portrayed in the videotape was false or misleading, it has failed to show that the misrepresentation was material in influencing any potential customer's decision. Derby must establish that Chestnut's alleged false advertising was material to consumers, or more simply, that the deception was likely to influence a reasonable consumer's purchasing decision. *Hot Wax, Inc. v. Turtle Wax, Inc.,* 191 F.3d at 819; see also *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia,* 898 F.2d 914, 922 (3d Cir. 1990). A "[p]laintiff must make some showing that the defendant's misrepresentation was 'material' in the sense that it would have some effect on consumers' purchasing decision." J. Thomas McCarthy, *4 McCarthy on Trademarks and Unfair Competition* § 27:35 (4th ed.1997). As correctly noted by Chestnut, Derby has chosen to ignore this requisite element in establishing its claim, offering no testimony on this point at the preliminary injunction hearing.

Similarly to this court's finding in *Marcyan v. Nissen Corp.,* 578 F.Supp. 485, 507 (N.D.Ind.1982), aff'd 725 F.2d 687 (7th Cir. 1983), Derby has failed to establish that the videotape has resulted in any loss of sales. Moreover, the evidence supplied by Chestnut reveals that none of the potential customers who were supplied with the videotape purchased the mattresses after viewing the videotape. Further undercutting the importance that the MRT demonstration had on the potential of increased sales in the relevant market.

---

4. McManamy stated the following during the demonstration: "Keep in mind while you're watching this, all three of these mattresses do pass the California Technical Bulletin # 121 and # 129 that are generally used throughout the country as mattress fire performance tests, So, they do pass the California Tests." Ogburn then commented: "So all of them would be legal" referring to the mattresses used during the demonstration. (See video transcript at p. 2)

Derby apparently relies, without stating so in its submissions, on the alleged confusion of one of its customers to demonstrate that the videotape would have some material effect on the relevant market's purchasing decisions. However, as noted in *First Health* "[s]ome confusion and misunderstanding are inevitable in any business relation." 269 F.3d at 805. The materiality of the advertising dovetails with the requisite confusion required for an actionable Lanham Act claim. "The Lanham Act deals only with confusion that exceeds the norm in the human condition," and Derby has not shown that the confusion as to this particular customer exceeds that norm. *Id.* Furthermore, Derby has made no showing as to whether the confusion exhibited by the customer would in turn be a material factor in that particular customer's decision making process for purchasing either the Derby or Chestnut mattress. See *Haan Crafts Corp. v. Craft Masters, Inc.*, 683 F.Supp. 1234, 1241 (N.D.Ind. 1988).

**C. Whether Derby has demonstrated that there is no adequate remedy at law**

■ The second prong of the initial showing for a preliminary injunction requires Derby to demonstrate that no adequate remedy at law exists and it will suffer irreparable harm in order for the injunction to be issued. *Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 313–14 (7th Cir.1994). Derby offered no evidence during the hearing that the dissemination of the videotape has resulted in irreparable harm to its business either through lost sales, profits, or loss of goodwill. Furthermore, Derby failed to demonstrate any harm outside of the one customer who expressed confusion as a result of the videotape. Derby readily admits that it was able to clear up this confusion without any problems. (See P's Post Hearing Brief at p. 17; n.18). Furthermore, Derby has not

offered any evidence that any potential damage control expenses could not be recovered to compensate any damage from the dissemination in the event it were successful on its underlying claim. Therefore, in light of Derby's failure to meet the first two elements required for the issuance of a preliminary injunction the court will not address the next two threshold elements for the issuance of a preliminary injunction.

### IV. CONCLUSION

For the foregoing reasons the court now **DENIES** Derby Industries Inc. request for a preliminary injunction in light of the its failure to show a likelihood of success on the underlying merits of its Lanham Act claims and its failure to demonstrate that no adequate remedy at law exists. **IT IS SO ORDERED.**