John HAHN; Wade Liggett; Joseph Aizawa; V.G. Livingston; Hugh Fraser; Hide Aizawa, Plaintiffs–Appellants,

v.

OREGON PHYSICIANS' SERVICE; Physicians' Association of Clakamas County, Defendants–Appellees.

No. 87–3875.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 10, 1988.

Decided Nov. 4, 1988.

As Amended on Denial of Rehearing and Rehearing En Banc Feb. 27, 1989.

Martin L. Ziontz, Frank R. Morrison, Jr., Margaret A. Morgan, Bassett & Morrison, P.S., Seattle, Wash., for plaintiffs-appellants.

William B. Crow, Miller, Nash, Wiener, Hager & Carlsen, Portland, Or., for defendants-appellees.

Before HUG, FLETCHER and NELSON, Circuit Judges.

FLETCHER, Circuit Judge:

Appellants appeal the district court's grant of summary judgment to appellees dismissing appellants' claim of violation of the Sherman Act, 15 U.S.C. § 1. We reverse and remand.

## FACTS

Appellants are licensed doctors of podiatric medicine (D.P.M.'s) practicing in Oregon. Under state law, podiatrists are licensed to perform all foot procedures that medical doctors (M.D.'s) and doctors of osteopathic medicine (D.O.'s) may perform, except that they may not administer general or spinal anesthetics, or perform amputations. O.R.S. § 677.805(4).

Appellee Oregon Physicians' Service (OPS), founded by physicians, offers and administers a prepaid health care plan. At all relevant times, membership in OPS was limited to physicians and surgeons licensed to practice in Oregon. From 1974 to 1983, between 90 and 93 percent of all eligible M.D.'s and D.O.'s in Oregon were OPS members. In the same period, 16 percent of the population of the Portland metropolitan area were subscribers.[1]

In the early 1970s, several of the appellants applied for membership in OPS, but were denied under OPS's policy of admitting only physicians. At that time, a majority of OPS's governing board of trustees were physicians. In 1982 the board contemplated extending membership to additional classes of providers, but decided to offer membership only to optometrists.

OPS offers many different policies to its subscribers, with varying terms. Under a majority of these policies, OPS offers a two-tier system covering health care costs. OPS conducts a survey of the fees for various services submitted to it by individual member physicians. Once the data has been compiled, the fees are referred to as the "usual, customary and reasonable" rates (UCR). OPS then determines the 90th percentile of such fees—that is, the

1. Although the parties may not be in complete agreement, appellants have apparently identified Portland as the proper geographic market for antitrust analysis.

rate at which 90 percent of the sample group charges the same or less.

When a member physician treats an OPS subscriber, OPS pays the physician directly up to the 90th percentile rate. The member physician must accept the OPS payment as payment in full and may not bill the subscriber for any extra amount. Nonmembers, on the other hand, may bill subscribers at whatever rate they choose. A subscriber pays a nonmember's bill and is then reimbursed by OPS, but generally at a rate no more than at the 60th percentile of the UCR. Nonmembers, unlike members, may bill subscribers for the balance of their fees. Appellants produced evidence that, on average, OPS members received from OPS 76 cents on the dollar billed, while OPS paid podiatrists only 50 cents on the dollar billed. OPS subscribers were free to seek treatment from members or nonmembers as they wished.

In 1978, five of the appellants created the Fair Action Committee for Education, Inc. (FACE), a nonprofit corporation to which they assigned their antitrust claims against health care plans. FACE brought four separate antitrust actions against 12 prepaid health care plans in Oregon. In 1980, FACE was dissolved and the claims were reassigned to plaintiffs. Claims against five of the defendant health care plans were subsequently dismissed. The remaining seven defendants, including OPS, moved for summary judgment, alleging that their activity was exempt from the antitrust laws pursuant to the McCarran–Ferguson Act's exemption for the "business of insurance," 15 U.S.C. §§ 1011–1013, and arguing that plaintiffs had not shown sufficient impact on interstate commerce.

The district court granted defendants' motion for summary judgment. *Hahn v. Oregon Physicians' Serv.*, 508 F.Supp. 970 (D.Or.1981). The Ninth Circuit reversed, holding that defendants' conduct was not exempted, but remanded for a finding as to the effect on interstate commerce. *Hahn v. Oregon Physicians' Serv.*, 689 F.2d 840 (9th Cir.1982), *cert. denied*, 462 U.S. 1133, 103 S.Ct. 3115, 77 L.Ed.2d 1369 (1983). Appellants then settled with five of the remaining defendants.[2]

In 1984, a trial was held on the impact of defendants' activities on interstate commerce. The district court found adequate impact to support federal antitrust jurisdiction. Appellants subsequently settled with the only remaining defendant other than OPS. On September 12, 1986, OPS moved for summary judgment. Appellants responded by moving for summary judgment in their favor or, in the alternative, for partial summary judgment. They also moved for leave to file an amended complaint naming BCBSO as defendant and appellants' professional corporations as plaintiffs.

On February 11, 1987, the district court granted summary judgment to OPS and denied all the motions appellants had filed in response. On April 24, appellants' motion to alter or amend the judgment was denied; the judgment dismissing their action was entered on May 1. Appellants timely appealed.

## JURISDICTION

We assert jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## STANDARD OF REVIEW

■ We review a grant of summary judgment de novo, and will affirm if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Barry v. Blue Cross of California*, 805 F.2d 866, 868 (9th Cir.1986). Summary judgment is generally not favored in antitrust cases particularly because of their factual complexity, but it will be upheld if a plaintiff's complaint

---

2. In 1983, OPS merged with Blue Cross of Oregon to form Blue Cross/Blue Shield of Oregon (BCBSO). As the survivor corporation, BCBSO expressly assumed all of OPS's rights, obligations and liabilities. In August 1985, BCBSO for the first time decided to allow podiatrists to become members. This later change in policy does not moot this action, however. *See Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 340 n. 9, 102 S.Ct. 2466, 2471 n. 9, 73 L.Ed.2d 48 (1982).

lacked any significant supporting evidence. *Klamath–Lake Pharm. Assoc. v. Klamath Med. Serv. Bureau*, 701 F.2d 1276, 1281–82 (9th Cir.1983).

■ Where a plaintiff has alleged an illegal combination or conspiracy, a defendant seeking summary judgment has the burden of producing a plausible and justifiable explanation for its conduct that is consistent with proper business practices. Once the defendant has done so, the plaintiff must come forward with significant probative evidence capable of sustaining a reasonable inference that the defendant was not acting lawfully. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986); *Barnes v. Arden Mayfair, Inc.*, 759 F.2d 676, 680 (9th Cir.1985); *ALW, Inc. v. United Air Lines*, 510 F.2d 52, 55 (9th Cir.1975).

## DISCUSSION

■ Appellants argue that because they have adduced evidence that OPS was governed by a board controlled by physicians, that it expressly excluded non-physicians, and reimbursed nonmembers at a lower rate than members for the same services, they have made a prima facie case of a Section 1 violation.[3] Section 1 of the Sherman Act prohibits "[e]very contract, combination ... or conspiracy, in restraint of trade." 15 U.S.C. § 1. To establish a section 1 violation, appellants must show three elements: (1) an agreement or conspiracy, (2) resulting in an unreasonable restraint of trade, and (3) causing antitrust injury. *Rickards v. Canine Eye Registration Fdn.*, 783 F.2d 1329, 1332 (9th Cir.1986).

■ Some practices are so likely to interfere with competition that courts have found them to be per se Sherman violations. The per se rule is invoked when a challenged activity facially appears to be one that would always or almost always tend to restrict competition and decrease output. *Id.*, citing *NCAA v. Board of Re-*

*gents of Univ. of Okla.*, 468 U.S. 85, 100, 104 S.Ct. 2948, 2959, 82 L.Ed.2d 70 (1984). Such practices include horizontal price-fixing, division of markets and certain group boycotts. *See, e.g., Northwest Wholesale Stationers v. Pacific Stationery*, 472 U.S. 284, 290, 105 S.Ct. 2613, 2617, 86 L.Ed.2d 202 (1985) (group boycotts); *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 343–45, 102 S.Ct. 2466, 2472–74, 73 L.Ed.2d 48 (1982) (price-fixing); *United States v. Topco Associates, Inc.*, 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972) (territorial market divisions).

■ Per se violations are a limited class, however, and it is much more common for courts to analyze questionable activities under the rule of reason. The rule of reason looks beyond the inherent anticompetitive potential of an activity and examines its actual effect in practice. It imposes on the plaintiff the burden of establishing that the practice in question unreasonably restrains competition. *Rickards*, 783 F.2d at 1333.

■ Since the effect on competition is the touchstone of rule of reason analysis, the intent of the defendants is relevant but not dispositive. *See NCAA*, 468 U.S. at 103, 104 S.Ct. at 2961; *Wilk v. AMA*, 719 F.2d 207, 225 (7th Cir.1983). The existence of market power is a significant finding that casts an anticompetitive shadow over a party's practices in a rule-of-reason case. Ordinarily, it is an essential ingredient in a rule-of-reason case. Not so, however, where the conduct should be viewed as a per se violation. "[T]he absence of proof of market power does not justify a naked restriction on price or output." *NCAA*, 468 U.S. at 109, 104 S.Ct. at 2964.

Appellants allege that OPS's practices violate the Sherman Act in two ways: (1) as a horizontal price-fixing agreement; and (2) as a group boycott of podiatrists. Both such practices, they assert, constitute per se violations of Section 1. We address these claims in turn.

---

**3.** In their original complaint, appellants raised claims under both 15 U.S.C. §§ 1 and 2, and the district court granted summary judgment under both sections. Appellants, however, state that they withdrew their section 2 claim shortly before OPS moved for summary judgment. They have not argued a section 2 theory on appeal. Brief of Appellants at 3 n. 1.

## A. *Price Fixing*

Appellants argue that by setting a fee schedule of maximum rates of reimbursement, OPS has engaged in horizontal price-fixing. They claim that OPS's two-tier reimbursement system forces them to compete on unfavorable terms with member physicians. OPS pays member physicians directly at the 90th percentile rate and bars them from charging subscribers any more. Nonmembers, by contrast, must bill subscribers, who are then reimbursed by OPS, but usually only at the 60th percentile rate. To subscribers, then, the services of member physicians are available at no cost beyond their subscription costs. The services of nonmembers, however, may be available to subscribers only at additional out-of-pocket cost to subscribers unless the non-member-podiatrists are willing to accept the rate at which OPS will reimburse as payment in full. Appellants contend OPS's billing and reimbursement practices have cost them both revenue and patients. Further, they claim they cannot compete with OPS members on these terms. Since OPS does not permit them to become members, the practices adversely affect competition.

In *Maricopa County*, 457 U.S. 332, 102 S.Ct. 2466, member doctors of a medical society by agreement established maximum fees. The Maricopa Foundation operated similarly to OPS; it drew up a schedule of maximum fees, which participating doctors agreed to accept as payment in full for insured patients. *Id.* at 339, 102 S.Ct. at 2470. Insured patients were free to go to nonmember physicians, but were obligated individually to pay any excess that nonmembers charged above the fee schedule. *Id.* at 341, 102 S.Ct. at 2471.

The Court found the practice to be a per se violation of Section 1. That the agreement was intended to set a ceiling on prices rather than a floor did not make it any the less price-fixing. "The *per se* rule 'is grounded on faith in price competition as a market force [and not] on a policy of low selling prices at the price of eliminating competition.'" *Id.* at 348, 102 S.Ct. at 2475 (citation omitted). The Court found particularly objectionable the fact that doctors who might otherwise have been in competition had made the agreement. "Even if a fee schedule is [ ] desirable, it is not necessary that the doctors do the price fixing," the Court observed, and distinguished by way of example another insurance program of the Maricopa Foundation that was administered by a state agency rather than by doctors. *Id.* at 352–53, 102 S.Ct. at 2477–78. The Court expressly stated that it was not deciding "whether an *insurer* may, consistent with the Sherman Act, fix the fee schedule and enter into bilateral contracts with individual doctors." *Id.* at 353 n. 26, 102 S.Ct. at 2477 n. 26 (emphasis added). The Court noted that it had also not reached the issue in *Group Life & Health Ins. v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979). *Id.*

In *Royal Drug*, a group of independent pharmacists brought an antitrust action against Blue Shield of Texas for reimbursing subscribers at a higher rate when they bought from participating pharmacies than when they patronized non-participating pharmacies. Blue Shield had offered such an agreement to every pharmacy in the state. On remand from the Supreme Court, the Fifth Circuit answered the open question in the affirmative, distinguishing *Maricopa County* on the ground that the agreements did not run "between competitors in the pharmaceutical industry, nor between competitors in the insurance industry, but between individual pharmacies and Blue Shield, which does not compete with pharmacies." *Royal Drug Co. v. Group Life & Health Ins.*, 737 F.2d 1433, 1436–37 (5th Cir.1984). The court read *Maricopa County* not as a blanket condemnation of maximum medical fees, but as an affirmation that doctors may not, as *competitors*, horizontally enter into agreements to establish fees.

This circuit has agreed. In *Barry v. Blue Cross*, 805 F.2d 866, Blue Cross of California contracted with physicians to provide services to subscribers at a fixed rate to be set by Blue Cross. By statute, no more than one-third of Blue Cross's governing board could be physicians. Member physicians were reimbursed at 90

percent of the UCR, nonmembers at 60–70 percent. Both subscribers and members were free to deal with any patient, physician, or other insurer; the only restriction was that a member physician could not refer a subscriber to a nonmember without the subscriber's consent. *Id.* at 867–68.

We dismissed a Section 1 challenge to Blue Cross's practice. We did not consider *Maricopa County* controlling because we found no evidence to suggest that physicians controlled the Blue Cross plan; of the 126 members of various Blue Cross boards of directors, advisors, and senior staff, only 22 were physicians. *Id.* at 868–69. As a result, we found that the plan did not offend the antitrust laws under either a per se or a rule of reason analysis. *Id.* at 870.

The Fourth Circuit, however, applying a rule of reason analysis, held that the refusal of Blue Shield of Virginia to pay for services rendered by clinical psychologists unless they were billed through physicians violated the antitrust laws. *Virginia Acad. of Clinical Psychologists v. Blue Shield of Va.*, 624 F.2d 476 (4th Cir.1980). Blue Shield argued that its decision was unilateral, and that a corporation cannot conspire with itself under the antitrust laws. Plaintiffs, on the other hand, contended that Blue Shield plans were nothing more than combinations of physicians. *Id.* at 479, 481. The court agreed with plaintiffs, finding that "in a real and legal sense, the Blue Shield Plans are agents of their member physicians." *Id.* at 480. Looking "at substance rather than form," the court held that since the bylaws of Blue Cross of Virginia required a majority of its board of directors to be physicians, there was sufficient physician control of the organization to make Blue Cross's restrictions on payments to clinical psychologists a violation of the Sherman Act.[4] *Id.* at 480–81.

In a case in which non-member dentists who considered themselves disadvantaged by a prepaid dental plan of Blue Shield challenged the plan, the Third Circuit looked to the influence of dentists over

Blue Shield's policies, rather than to that of doctors. *Pennsylvania Dental Assoc. v. Medical Serv. Assoc. of Pa.*, 745 F.2d 248 (3d Cir.1984). The plan was similar to the plans for doctors—member dentists agreed to accept a set percentage of the UCR as full payment for treating Blue Shield subscribers. A subscriber's payments to a nonmember dentist would be reimbursed at the same rate, but the subscriber would be personally responsible for amounts charged above the UCR. *Id.* at 253.

The bylaws of Blue Shield provided for a board comprised of 16 lay persons and 16 doctors. Only two members of the 32 were dentists. *Id.* The Third Circuit held that to sustain its claim, the plaintiff would have to show that member dentists, through their majority membership on two Blue Shield committees, actually controlled the UCR system. *Id.* at 256. Since it found that the committees were advisory only and real control was vested in the board, and since dentists accounted for only one-sixteenth of that body, the court upheld the district court's grant of summary judgment. *Id.* at 258–59. The court distinguished *Virginia Academy*, noting that the evidence in that case tended to show physician control. *Id.* at 257.

In the case before us, the district court granted summary judgment to OPS on the price-fixing claim on the ground that the majority of the OPS board, although physicians, did not compete economically with appellants for the provision of foot care in the relevant market. The court also found no evidence that any OPS members who did compete with appellant had conspired with OPS trustees. The court also ruled as a matter of law that under *Barry*, "health care plans like the OPS/BCBSO plan described here do not violate antitrust laws."

■ On the record before us, we cannot agree. Read together, *Maricopa County*, *Barry*, *Royal Drug*, *Virginia Academy* and *Pennsylvania Dental* stand for the broad proposition that health care plans may reimburse members and nonmembers differently, both in price and manner, so

---

4. Although the decision in *Virginia Academy* predates *Maricopa County* by two years, the Fourth Circuit's opinion followed substantially similar reasoning.

long as physicians (or the relevant group of competitive providers) do not control the health care plan.[5] In *Barry*, it was because the plaintiffs had failed to produce any evidence of physician control of the price-setting entity that we upheld the agreement as to prices and reimbursement. We fully recognized, however, that "a horizontal agreement among competing physicians ... is per se unlawful under section 1" and *Maricopa*. *Barry*, 805 F.2d at 868. Likewise, *Royal Drug* upheld the challenged practice because it did not arise from an agreement "between *competitors*." *Royal Drug*, 737 F.2d at 1436 (emphasis added). Conversely, the *Virginia Academy* court did find proscribed activity where the health plans at issue were mere "agents of their member physicians." *Virginia Academy*, 624 F.2d at 480.

Based on the evidence plaintiffs have so far produced, their case is more akin to *Maricopa* than to *Barry*. They have shown, for instance, that physicians formed a majority of the board for many of the years in question.[6] They have also alleged that physicians who practice in any of 20 specialities perform procedures that podiatrists perform.[7] Accordingly, many doctors are direct competitors to podiatrists, at least as to some of their services.

The district court stated that the majority of the OPS board did not, in fact, compete economically with the appellants in Portland. The court found that on a "typical" OPS board in the relevant years, a majority of trustees did not practice in Portland, and that many others had retired from practice. Accordingly, it concluded that a majority of trustees "would have no economic interest in restraining trade in the provision of foot care services in Portland."

Even if board members did not compete directly with the appellants, it cannot be determined as a matter of law that the board members had no economic interest in restraining trade. The proper inquiry is not whether individual board members *themselves* were in actual competition with the complaining nonmembers. Rather, the proper inquiry is whether practitioners sharing substantially similar economic interests collectively exercised control of a plan under whose auspices they have reached agreements which work to the detriment of competitors. *See* generally *Maricopa County*, 457 U.S. 332, 102 S.Ct. 2466.[8] The challenged plan in *Barry* passed muster because it was "not an organization of physicians." *Barry*, 805 F.2d at 868. Similarly, the fact that physicians

---

5. We recognize, however, that this rule may not be applicable to some health plans, such as health maintenance organizations, in which "persons who would otherwise be competitors pool their capital and share the risks of loss as well as the opportunities for profit. In such joint ventures, the partnership is regarded as a single firm competing with other sellers in the market." *Maricopa County*, 457 U.S. at 356, 102 S.Ct. at 2479. In such an arrangement, involving a "functionally integrated group of doctors," it is the doctors, rather than the patient or the insurer, who bear the economic risk. *Id.* at 339 n. 7, 102 S.Ct. at 2470 n. 7. Thus, for example, the Supreme Court has stated that "[i]f a clinic offered complete medical coverage for a flat fee, the cooperating doctors would have the type of partnership arrangement in which a price-fixing agreement among the doctors would be perfectly proper." *Id.* at 357, 102 S.Ct. at 2479–80. No such arrangement is present in this case.

6. The district court found that a 1978 amendment to the OPS bylaws required 50 percent non-physician members on the OPS board.

7. The twenty listed specialities are: "(1) allergists, (2) anesthesiologists, (3) cardiovascular disease specialists and surgeons, (4) dermatologists, (5) endocrinologists, (6) family practitioners, (7) geriatric specialists, (7a) hematologists, (8) general practitioners, (9) diagnosis and internal medicine specialists, (10) infectious disease specialists, (10a) industrial practice specialists, (11) neurologists and neurosurgeons (12) oncologists, (13) orthopedic surgeons, (14) pathologists, (14a) physical medicine—rehabilitation specialists, (15) pediatricians, (16) plastic surgeons, (17) radiologists, (18) rheumatologists, (19) general surgeons, and (20) vascular surgeons." Brief of appellants, at 14.

8. *See also Radiant Burners, Inc. v. Peoples Gas, Light & Coke Co.*, 364 U.S. 656, 657 n. 1, 659–60, 81 S.Ct. 365, 366 n. 1, 367–68, 5 L.Ed.2d 358 (1961) (though only six among "numerous" members of gas association directly competed with plaintiff, Sherman 1 claim was stated even in absence of proof that six direct competitors controlled association, because association members as a whole shared substantially similar economic interests).

held half of the board seats in *Pennsylvania Dental* was irrelevant where the only potential competitors of the plaintiffs—dentists—held but two of 32 seats. Indeed, the *Pennsylvania Dental* court contrasted the dentists' negligible power with the physicians' controlling position in *Virginia Academy*. *Pennsylvania Dental*, 745 F.2d at 257.

 Appellants in this case have made a sufficient factual showing to survive summary judgment. The appellants presented evidence by way of affidavit indicating that from 1975–81, physicians were responsible for 90% of foot care billings to OPS. This suggests that OPS member physicians are a significant competitive force in the Portland foot care market. Under these circumstances, we conclude that the appellants' evidence that physicians occupied a majority of the board seats supports an inference that OPS is controlled by competitive providers. In other words, the appellants have introduced sufficient evidence to permit a trier of fact to conclude that the OPS plan was, in fact, "an organization of physicians," *Barry*, 805 F.2d at 868, or "an agent[ ] of [its] member physicians," *Virginia Academy*, 624 F.2d at 480. A trier of fact could reasonably conclude that the physician board members, even if not themselves competing directly with podiatrists, shared similar economic interests with those board members and OPS physicians who did compete directly, and that therefore the OPS board as a whole may have acted in the anticompetitive interests of those member physicians who compete with podiatrists for the provision of foot care. The lack of evidence of an overt conspiracy is not dispositive. If the OPS plan was, in fact, a horizontal agreement among competitors, it was unlawful per se. *See Barry*, 805 F.2d at 868.

We conclude that, construing the evidence in the light most favorable to appellants, the district court acted precipitously in ruling as a matter of law that they were not entitled to judgment.

### B. *Group Boycott*

Appellants also claim that they have made a prima facie showing that the exclusion of podiatrists from OPS, taken together with the discriminatory reimbursement policies for their services as non-members, constitutes a "group boycott" under Section 1.

Group boycotts, sometimes called concerted refusals to deal, commonly are considered business practices that merit per se invalidation under section 1. *Northwest Wholesale*, 472 U.S. at 290, 105 S.Ct. at 2617. However, the Supreme Court has cautioned lower courts not to be overinclusive in defining the categories of refusals to deal that amount to *per se* violations. "Cases to which this Court has applied the *per se* approach have generally involved joint efforts by a firm or firms to disadvantage competitors by 'either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle.' " *Id.* at 294, 105 S.Ct. at 2619, quoting L. Sullivan, Law of Antitrust 261–62 (1977).

*Northwest Wholesale* identified three characteristics as indicative of per se illegal boycotts: (1) the boycott cuts off access to a supply, facility, or market necessary to enable the victim firm to compete; (2) the boycotting firm possesses a dominant market position; and (3) the practices are not justified by plausible arguments that they enhanced overall efficiency or competition. *Id.* Under these or similar circumstances, the Court held, the danger of anticompetitive injury was sufficiently great that per se treatment was warranted. *Id.*[9]

In the absence of such a showing, however, the Court has since admonished that the category of activities comprising group boycotts "is not to be expanded indiscriminately." *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 458, 106 S.Ct. 2009, 2018, 90 L.Ed.2d 445 (1986). Of particular relevance to this case, the Court added: "Moreover, we have been slow to condemn

---

**9.** The Court's approach seems to suggest that the facts be developed as in a rule of reason case, or at least almost as fully, in order to determine whether the conduct is per se illegal.

rules adopted by professional associations as unreasonable *per se* ... and, in general, to extend *per se* analysis to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious." *Id.* at 458–59, 106 S.Ct. at 2018.

However, the Court has not evidenced a similar reluctance to apply a rule of reason analysis to strike down rules of professional associations. In *Indiana Federation of Dentists*, the dentists formed a federation to continue the Indiana Dental Association's former policy of refusing to submit x-rays to dental health insurers with dental claim forms. Insurers requested the x-rays so that their administrators could determine whether the recommended course of treatment was reasonable. Applying a rule of reason test, the Court ruled that the Federation's practice violated the antitrust laws.

*Barry* is instructive on the approach in this circuit to group boycott claims against professional organizations. The court applied rule of reason analysis to determine the effect on competition of Blue Cross's agreement with physicians. The *Barry* plaintiffs argued that the Blue Cross plan had the effect of boycotting nonmember physicians by interfering with their access to subscribers. Since nonmember services were reimbursed at a lower rate, the difference to be paid by the individual patient, they contended, few patients would consent to referral to a nonmember; this was tantamount to a refusal to deal. We rejected this argument, reasoning that the diversion of patients from other physicians was little different from

> the ordinary consequence of every commercial contract.... When a consumer contracts to buy services from one health plan, the consumer will then have little or no demand for the services of a non-participating physician, especially if the consumer would have to pay more for those services. The contract does not

mean that the parties have agreed to an unlawful concerted refusal to deal.

*Barry*, 805 F.2d at 872. In upholding the practice, however, we took pains to distinguish *Virginia Academy*, in which there was also an allegation of boycott:

> [i]n that case, Blue Shield reimbursed for psychologists' services only when billed through a member physician. Psychiatrists, who compete with psychologists, did not face this obstacle because, as medical doctors, they could simply become members of Blue Shield. By contrast, in the present case, Blue Cross *does not discriminate* against a particular class of medical provider, but instead is willing to purchase services from all physicians on equal terms.

*Id.* at 873 (emphasis added).

Obviously, the fact that OPS *does* discriminate against a class of providers distinguishes this case from *Barry*. While, standing alone, OPS's two-tier fee system could probably withstand a "boycott" challenge under *Barry*, when coupled with OPS's long refusal to admit podiatrists, it is doubtful whether OPS was, in fact, "willing to purchase services from all [practitioners] on equal terms." *Id.*

OPS has the burden under *Barnes* of putting forward a plausible, justifiable explanation for its conduct. It stipulated that it would "not defend this case in any way on the basis that the quality of health care provided by podiatrists is inferior to that provided by other providers of health care." Instead, it claims that "problems with podiatrist claims overutilization"[10] motivated its decision to exclude podiatrists from membership. Brief of Appellee at 9. Even if this is a plausible and legitimate basis for exclusion, we find that appellants sustained their burden under *Barnes* of raising a reasonable inference, grounded in evidence, to refute OPS's claimed justification. Again without deciding any factual issues, we note that the record includes testimony from a former OPS board member, Dr. Price, suggesting that the exclu-

---

**10.** It is unclear whether the contention is that patients sought unnecessary care or that podia-

trists performed unnecessary procedures.

sion of podiatrists was prompted neither by considerations of cost nor by fears of over-billing. Appellants have also produced evidence that the overall costs for foot procedures performed by podiatrists were lower than those of OPS members. *See* Reply Brief of Appellants at 13–14.

Viewing the evidence in the light most favorable to appellants, we must conclude that they are entitled to go to trial on their group boycott theory. Whether ultimately the conduct can be sustained as justified or should be condemned, should be determined after a fully developed record at trial. Summary judgment should not have been granted.

## CONCLUSION

Appellants ask that we direct the district court to enter summary judgment in their favor. We conclude that genuine issues of material fact remain. In such a case that is rife with factual complexity, summary judgment for either side is rarely justified. *See Barnes*, 759 F.2d at 681. Accordingly, we decline appellants' invitation, reverse the summary judgment in favor of OPS and remand for trial.

REVERSED AND REMANDED.