# United States Court of Appeals
## For the First Circuit

No. 01-2718

THE PODIATRIST ASSOCIATION, INC., ET AL.,
Plaintiffs, Appellants,

v.

LA CRUZ AZUL DE PUERTO RICO, INC. AND TRIPLE-S, INC.,
Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Héctor M. Laffitte, U.S. District Judge]

Before

Selya, Circuit Judge,
Coffin, Senior Circuit Judge,
and Lipez, Circuit Judge.

Kevin G. Little, with whom Law Offices of David Efron was on brief, for appellants.
Gilberto J. Marxuach-Torrós, with whom Arturo J. García-Solá and McConnell Valdés were on brief, for appellee La Cruz Azul de Puerto Rico.
Luis A. Oliver-Fraticelli, with whom Fiddler, Gonzalez & Rodriguez LLP was on brief, for appellee Triple-S, Inc.

June 12, 2003

**SELYA**, **Circuit Judge**. This antitrust case requires us to examine the structure and operation of health-care delivery in an era marked by a bewildering array of insurer and provider arrangements. The plaintiffs, appellants here, represent the interests of podiatrists in Puerto Rico. They sued La Cruz Azul de Puerto Rico (Blue Cross) and Triple-S, Inc. (Triple-S) in the federal district court complaining, inter alia, that the defendants had conspired with medical doctors to exclude podiatric care from their standard benefits packages during the period from 1995 to 1999. The district court concluded that the plaintiffs had offered insufficient evidence that physicians controlled the plans' policymaking functions with respect to either insurance benefits or reimbursement rates (and, therefore, had offered insufficient evidence of concerted action). Accordingly, the court granted summary judgment in the defendants' favor. Relatedly, the court dismissed a Lanham Act claim against Blue Cross. The plaintiffs appeal from these determinations. We affirm.

## I. BACKGROUND

Except for the Lanham Act count (as to which the allegations of the amended complaint control), we glean the relevant facts from the summary judgment record. We draw all reasonable inferences in the plaintiffs' favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). Our recital begins with a roster of the protagonists, proceeds to detail the plaintiffs'

-2-

claims and the facts upon which they rely, and then summarizes the district court's main holdings.

## A.  **The Protagonists**.

The plaintiffs include the Podiatrist Association (a non-profit trade association), a number of practicing podiatrists, their spouses, and their conjugal partnerships.  Inasmuch as the podiatrists are the real parties in interest, we shall discuss the matters sub judice as if they were the sole plaintiffs.

Podiatrists are licensed health-care providers in Puerto Rico (as elsewhere).  They afford medical care to the foot and lower extremities.  Podiatrists attend four-year schools of podiatric medicine.  Those who successfully complete the curriculum are awarded D.P.M. degrees and become doctors of podiatric medicine.  Once admitted to practice, podiatrists provide services that are similar to those offered by some medical doctors, so that the two groups compete against each other for certain patients. One court has suggested that podiatrists can furnish comparable services at lower costs.  See Hahn v. Or. Physicians' Serv., 868 F.2d 1022, 1032 (9th Cir. 1988).  Along this line, the plaintiffs' amended complaint alleges, albeit without supporting evidence, that podiatrists offer services that are not only "of equal or better quality" than those provided by medical doctors but also "generally less expensive."

The defendants are Puerto Rico's two major providers of health-care insurance.[1] They do not contest the plaintiffs' allegation that Triple-S enjoys roughly 36% of Puerto Rico's health insurance market and Blue Cross enjoys roughly 25% of that market.

Triple-S is a for-profit corporation. From 1995 forward, its board of directors has been composed of nineteen members, eight of whom are medical doctors. The other members include a dentist, hospital officials, and community representatives. The board has complete control over corporate policymaking, and all changes in the benefits packages and reimbursement rates established by Triple-S are subject to board approval. The executive committee, which exercises responsibility over corporate policies between board meetings, consists of seven board members. Since 1995, three of those members — the president, vice-president, and secretary — have been medical doctors. The medical director, who reports to the board, is required by the corporation's bylaws to have an M.D. degree.

---

[1]Describing the defendants' product line as "insurance" is somewhat of a misnomer. The McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015, exempts "the business of insurance" from federal antitrust laws. Id. § 1012(b). The Supreme Court has recognized, however, that benefit plans, although typically marketed as health insurance, more closely resemble pre-payment plans in which the primary objective is not to shift the risk of loss, but, rather, to provide health-care services to subscribers. See Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 214-15 (1979); see also Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119, 127-29 (1982). In the aftermath of Royal Drug, courts have freely subjected companies like Blue Cross and Triple-S to antitrust scrutiny.

Blue Cross has a more complicated corporate history. Before 1998, it functioned as a non-profit corporation. Its twenty-eight board members included seven medical doctors, seven hospital executives, and fourteen subscriber representatives. Blue Cross became a for-profit corporation in 1998. Upon its conversion to for-profit status, Blue Cross established a fourteen member board of directors. All the members represented subscribers; none of them were medical doctors. In November of that year, Independence Holdings, a wholly-owned subsidiary of Independence Blue Cross, acquired a majority of its shares. At that time, the board was pared to seven members (none of whom are medical doctors).

When it functioned as a non-profit, Blue Cross had a fees and contracts committee that was responsible for proposing and evaluating benefits packages and reimbursement policies. The committee consisted of eight members: two medical doctors, two hospital executives, and four subscriber representatives. Blue Cross also maintained a medical advisory committee composed of three medical doctors (all of whom doubled in brass as board members). Despite the existence of these committees, all major decisions concerning benefits and reimbursement rates remained subject to the board's approval.

## B.  **The Plaintiffs' Allegations**.

The plaintiffs' amended complaint mounts two kinds of claims.  The first set, involving alleged antitrust violations, are rooted in Section 1 of the Sherman Act, 15 U.S.C. § 1, and a parallel local-law provision, 10 P.R. Laws Ann. § 258 (1997).  In a related vein, the plaintiffs charged both defendants with having engaged in unfair business practices in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and Article 1802 of the Civil Code, 31 P.R. Laws Ann. § 5141 (1990).

The plaintiffs' antitrust claims start with the premise that the defendants have favored medical doctors by excluding podiatrists, podiatric care, and ancillary services essential to podiatric care from their basic health insurance coverages; that even when podiatric care is covered, the defendants reimburse podiatrists at lower rates than those paid to medical doctors for comparable services; and that many patients who are in need of foot care turn to medical doctors rather than podiatrists.  The plaintiffs further aver that this favoritism is no accident:  in their view, the defendants and the internal decisionmaking processes used to formulate their benefits packages have been dominated by medical doctors, so that the discrimination that permeates the plans' activities is the outgrowth of a conspiracy that has placed anticompetitive restraints on trade.  These restraints operate, the plaintiffs say, to increase prices

-6-

(diverting patients to more expensive treatment, i.e., treatment by medical doctors), decrease output (driving some patients to forgo podiatric care altogether), and curtail podiatrists' earnings.

In support of these antitrust claims, the plaintiffs point to the following evidence. First, they remark that physicians have served on the defendants' boards of directors and have occupied key decisionmaking positions within the defendants' organizational structures. In contrast, no podiatrist has ever participated in either defendant's governance apparatus. Second, the plaintiffs identify specific meetings in which the defendants' exclusionary benefits policies were discussed and approved. They assert that those meetings were dominated by physicians.

The second type of claim mounted by the plaintiffs accuses the defendants of making false representations regarding the quality of podiatric care. In this regard, the plaintiffs allege that the defendants spread misinformation to subscribers regarding the competency of podiatrists, the relative professionalism of podiatrists vis-à-vis medical doctors, and the limited availability of reimbursement for podiatric care. The plaintiffs claim that these disparaging comments caused them both economic loss and reputational damage.

The current dispute is emblematic of the nationwide conflict between physicians and other participants in the health-care market. See, e.g., Flegel v. Christian Hosp., 4 F.3d 682 (8th

-7-

Cir. 1993); Bhan v. NME Hosps., Inc., 929 F.2d 1404 (9th Cir. 1991); Va. Acad. of Clinical Psychologists v. Blue Shield, 624 F.2d 476 (4th Cir. 1980). Podiatrists have long been part of this conflict. In the past, they have accused physicians of employing anticompetitive means to place hospital staff privileges beyond their reach, e.g., Cooper v. Forsyth County Hosp. Auth., Inc., 789 F.2d 278, 279 (4th Cir. 1986), battled with physician-dominated boards to determine what podiatric services qualify for Medicare reimbursement, e.g., Conn. State Med. Soc'y v. Conn. Bd. of Exam'rs in Podiatry, 524 A.2d 636, 637-38 (Conn. 1987), and fought against perceived conspiracies to exclude podiatric care from insurance coverage, e.g., Hahn, 868 F.2d at 1024-25. Consequently, we are able to view the current hostilities through the prism of a significant body of case law.

## C. **Travel of the Case**.

The plaintiffs sued on December 9, 1999, and filed an amended complaint on March 28, 2000. Shortly thereafter, Blue Cross moved for summary judgment with respect to the antitrust claims and for dismissal of the remaining claims. The district court permitted the plaintiffs to undertake discovery on the issues raised in the summary judgment motion. While those motions were pending, Triple-S moved for summary judgment on all claims asserted against it. The parties appear to have assumed that discovery could go forward on the issues framed by this motion.

On September 19, 2001, the district court, in two parallel opinions, granted substantially all the relief requested by the defendants. See Podiatrist Ass'n, Inc. v. Cruz Azul de P.R., Inc., No. 99-2336 (D.P.R. Sept. 19, 2001) (unpublished); Podiatrist Ass'n, Inc. v. Triple-S, Inc., No. 99-2336 (D.P.R. Sept. 19, 2001) (unpublished). In each instance, the court focused its antitrust analysis on the issue of whether physicians controlled the particular defendant's benefits policies and concluded that the plaintiffs had failed to show such control. The court also granted summary judgment for Triple-S on the Lanham Act count. As to Blue Cross, the court determined that the plaintiffs had failed to state an actionable Lanham Act claim and granted that defendant's motion to dismiss. Moreover, the court determined that issue had not properly been joined on certain claims against Triple-S, see infra Part II(C), and left those claims for later resolution.

Having disposed of most of the causes of action asserted under federal law, the court declined to exercise supplemental jurisdiction over the claims asserted under Article 1802 of the Civil Code. Those claims were dismissed without prejudice. See 28 U.S.C. § 1367(c); see also Martinez v. Colon, 54 F.3d 980, 990 (1st Cir. 1995) (upholding dismissal without prejudice of pendent local-law claims when the district court determined "far in advance of trial that no legitimate federal question existed"). After the plaintiffs dropped the residuum of potential federal claims against

-9-

Triple-S (a matter to which we shall return), this timely appeal ensued.

## II.  ANALYSIS

On appeal, the plaintiffs hawk several assignments of error.  First, they challenge the district court's resolution of the "physician control" issue.  Second, they maintain that the lower court evaluated only one of a myriad of antitrust theories set forth in their amended complaint.  Finally, they contend that the court improperly granted Blue Cross's motion to dismiss the Lanham Act claim.  We first confront the arguments relating to the antitrust claims and then discuss the district court's disposition of the Lanham Act claim.[2]

### A.  **The Principal Antitrust Claim**.

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade."  15 U.S.C. § 1.  That language establishes two prerequisites for a Section 1 claim.  First, the plaintiff must show concerted action between two or more separate parties.  Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761 (1984).  Second, the plaintiff must show that such action unreasonably restrains trade.  Nynex Corp. v. Discon, Inc., 525 U.S. 128, 133 (1998).  The district court restricted its analysis to the first of these prerequisites, finding insufficient

---

[2]The plaintiffs do not appeal the entry of summary judgment in favor of Triple-S on the Lanham Act claim.  Consequently, we limit our Lanham Act discussion to the claim against Blue Cross.

evidence to support the plaintiffs' allegation that the defendants' benefits policies were born out of concerted action.  We test this conclusion against the summary judgment standard.

1.  **The Standard of Review**.  The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990) (quoting Fed. R. Civ. P. 56 advisory committee's note).  Thus, summary judgment is appropriate as long as "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

We afford plenary review to orders granting or denying summary judgment.  Garside, 895 F.2d at 48.  Like the district court, we "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor."  Griggs-Ryan, 904 F.2d at 115.  Despite this favorable presumption, the evidence relied upon by the party opposing summary judgment must suffice to show a genuine issue of material fact, that is, a bona fide dispute about a fact that has the potential of affecting the outcome of the case under the applicable law.  United States v. One Parcel of Real Prop.

-11-

(Great Harbor Neck, New Shoreham, R.I.), 960 F.2d 200, 204 (1st Cir. 1992).

To be sure, the Supreme Court has cautioned that, in antitrust cases, "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." Hosp. Bldg. Co. v. Trustees of Rex Hosp., 425 U.S. 738, 746 (1976) (discussing Poller v. Columbia Broad. Sys., Inc., 368 U.S. 464, 473 (1962)). This does not mean, however, that summary judgment is unavailable in antitrust cases. See First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 289-90 (1968); see also Texaco P.R., Inc. v. Medina, 834 F.2d 242, 247 (1st Cir. 1987) (noting that "the courts, including the Supreme Court, now more freely approve" the use of summary judgment in such cases). More to the point, the doctrine has no force in cases in which the plaintiff has been afforded sufficient opportunity for discovery. See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986). This is such a case.

2. **Sufficiency of the Evidence**. Against this backdrop, we turn to the plaintiffs' basic allegation: that the evidence supports a finding of an anticompetitive conspiracy between and among those physicians who served on the defendants' boards and the defendants themselves. This allegation does not get them very far, for the Supreme Court has largely dismissed the possibility of an intraenterprise conspiracy as a basis for liability under Section

1 of the Sherman Act.  See Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984); see also VII Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1470 (2d ed. 2003) (describing as "universally accepted" the proposition that "a corporate officer cannot conspire with his own corporation").  In other words, agreements between two or more actors who operate within and for the benefit of a single economic enterprise do not satisfy the concerted action requirement of Section 1.  Copperweld, 467 U.S. at 769.

That does not end our inquiry, for the Copperweld Court intended to exempt conduct from the rigors of Section 1 only when the actors, collectively, "pursue[] the common interests of the whole rather than interests separate from those of the corporation itself."  Id. at 770.  A different analysis is required when the alleged coconspirators, regardless of their status, pursue interests that diverge from those of the enterprise itself. Sullivan v. Nat'l Football League, 34 F.3d 1091, 1099 (1st Cir. 1994); VII Areeda & Hovenkamp, supra, ¶¶ 1471a, 1471e2.  This nuance does not help the plaintiffs in this case because they have not submitted any evidence suggesting that physicians on either board have their own agendas or harbor private economic interests distinct from those of the corporations themselves.  Inasmuch as nothing in the record lends support to a conclusion that those physicians acted as independent, self-interested economic agents,

the plaintiffs have not articulated a claim that involves anything more than activity occurring within a single enterprise. As we have said, such a claim falls within the sphere of Copperweld preclusion (and, accordingly, fails to articulate a viable antitrust claim).

In a variation on this theme, the plaintiffs argue that physicians controlled the defendants and their benefits policies, so that each defendant was little more than a corporate carapace housing a conspiracy among physicians. According to this argument, the defendants' benefits policies were products of the antecedent conspiracy.

This argument focuses our attention on the issue of physician control. After all, when competing health-care providers challenge an insurer's benefits policies, alleging exclusionary practices instigated by physicians, those providers must make a threshold showing that the physicians effectively control the health-care plan. Hahn, 868 F.2d at 1029; Pa. Dental Ass'n v. Med. Serv. Ass'n, 745 F.2d 248, 256 (3d Cir. 1984); Va. Acad. of Clinical Psychologists, 624 F.2d at 481. This is as it should be, for a health insurer's actions can reflect an agreement in restraint of trade among physicians only if, and to the extent that, the insurer is an instrumentality of the physicians' concerted action. See VII Areeda & Hovenkamp, supra, ¶ 1475a.

The district court characterized the inquiry as one involving whether the physicians operated a "structural conspiracy" within the defendants' corporate skeletons. It examined the makeup of the defendants' boards and the identity of key decisionmakers. Based on this appraisal, the court ruled that the record did not contain evidence adequate to establish that physicians either dictated the defendants' benefits policies or otherwise exercised the requisite degree of control. The plaintiffs challenge this assessment.

The inquiry into whether an organization represents, or is a reflection of, the concerted action of conspiring economic actors is a functional one. See United States v. Sealy, Inc., 388 U.S. 350, 352-53 (1967) ("[W]e look at substance rather than form . . . [and] we are moved by the identity of the persons who act, rather than the label of their hats."). Thus, the preferred approach — and the one that we adopt — is to examine the composition of a corporation's board to determine whether a particular group has exercised (or has the ability to exercise) majority control. See, e.g., Hahn, 868 F.2d at 1030; Pa. Dental Ass'n, 745 F.2d at 258; Va. Acad. of Clinical Psychologists, 624 F.2d at 480.

Regarding Triple-S, the plaintiffs managed to establish nothing more than that physicians held eight of the nineteen seats on the board. That is a minority position — and plainly not enough

to show control.  The corporate bylaws make manifest that board action requires a majority vote, and the physicians simply do not constitute a majority.  Nor can they achieve control under the extant circumstances; the bylaws specify that at least ten of the nineteen board members must at all times be non-physicians.

The plaintiffs' fallback position covers a great deal of ground.  They asseverate that physicians have enough representation on the board to influence board decisions; that physicians play important roles when Triple-S formulates its restrictive benefits policies; that many key executives of Triple-S, including the board chair and medical director, are physicians; and that physicians occupy three of seven seats on the executive committee.  This is a mixture of unsupported conclusions and marginally relevant (but ultimately unconvincing) facts.

The first two statements are argumentative.  The mere fact that physicians have some input into Triple-S's decisionmaking processes does not show control.  See, e.g., Barry v. Blue Cross, 805 F.2d 866, 868-69 (9th Cir. 1986); Pa. Dental Ass'n, 745 F.2d at 258.  Without hard proof that physician input metamorphosed into physician dominance — and the summary judgment record contains none — these exhortations do not advance the plaintiffs' cause.

The second two statements are factual, but not probative.  It is true that certain of Triple-S's ranking executives are medical doctors and that three of them serve on its executive

-16-

committee. But such facts, without more, prove very little. See Pa. Dental Ass'n, 745 F.2d at 258 (discounting the influence of physicians serving on certain committees when corporate bylaws vested ultimate control in the board); see also Barry, 805 F.2d at 868-69 (employing the same reasoning when company rules placed ultimate control elsewhere).

Here, there is no "more." The plaintiffs have wholly failed to show how the placement of these individuals translates into control. Equally as important, they have not shown how their placement suffices to overcome the significance and role of the board. The corporate bylaws state unambiguously that all business decisions and policy changes are subject to board approval, and nothing in the record suggests that the board relinquished this authority. Absent some probative evidence that board approval was a rubber stamp — an ingredient that is lacking here — the antitrust claim against Triple-S cannot stand.

The plaintiffs likewise have failed to adduce sufficient evidence to suggest that Blue Cross is under physician control. The record shows that, during the period from 1995 to 1998, physicians constituted a distinct minority of the board (holding seven out of twenty-eight seats). This was not fortuitous: both the corporation's former bylaws and the relevant provisions of Law 152, 6 P.R. Laws Ann. § 43(1) (1994), demanded this minority status. From 1998 forward, the possibility of physician control

-17-

seems even more remote; the corporation became a for-profit entity, and the board became a physician-free zone.

In a creative formulation, the plaintiffs attempt to change the arithmetic by pointing out that physicians and hospital executives collectively held half of the seats on Blue Cross's non-profit board. This is mathematically accurate — the twenty-eight member board included seven physicians and seven hospital representatives — but legally irrelevant. The record is barren of any evidence indicating that these two groups worked as a unit or even that they shared common economic interests. Certainly, we cannot infer as much in the absence of any proof. Physicians and hospitals are in some respects natural enemies, squabbling over how to divide the steadily shrinking portion of premium dollars that insurers devote to provider reimbursement. See, e.g., Jeffrey E. Harris, Regulation and Internal Control in Hospitals, 55 Bull. N.Y. Acad. of Med. 88, 90-95 (1979) (discussing structural and historical tensions pitting hospital administrators against medical staff).

The plaintiffs' next initiative is to note that physicians occupied certain ancillary offices, such as positions on the fees and contracts committee and the medical committee. They couple this with an assessment of the roles that these committees played in Blue Cross's operations. From these facts, they argue that physicians were responsible for the development of the

insurer's policies.  As with Triple-S, however, we can attach no special significance to the unadorned fact of physician participation on any committee.  See Barry, 805 F.2d at 868-69; Pa. Dental Ass'n, 745 F.2d at 258.  This is especially true in light of the bylaw provision that expressly grants the Blue Cross board "the sole authority to set . . . the services to be offered to the subscribers."

To sum up, the plaintiffs have failed to establish the first foundational element of their argument.  The defendants' boards retained the ultimate say over their benefits policies and reimbursement rates, and physicians were represented sparsely (if at all) on these boards.  By the same token, the plaintiffs have not established that physicians exercised the requisite degree of control over policymaking in any other fashion.  Accordingly, the district court did not err in granting summary judgment on the plaintiffs' "structural conspiracy" antitrust claim.

Let us be perfectly clear.  We base this ruling on the plaintiffs' failure to muster evidence showing physician control. We hasten to add, however, that for purposes of Section 1 of the Sherman Act, control is a necessary but not a sufficient condition for finding concerted action.  See, e.g., Arizona v. Maricopa County Med. Soc'y, 457 U.S. 332, 356 (1982); Broad. Music, Inc. v. Columbia Broad. Sys., Inc., 441 U.S. 1, 22 (1979); see also VII Areeda & Hovenkamp, supra, ¶ 1478.  Even then, satisfying the

concerted action requirement is but one precondition to establishing a Section 1 violation.  See, e.g., NCAA v. Bd. of Regents, 468 U.S. 85, 98-101 (1984).  This appeal, however, turns on the question of whether physicians exercised the requisite degree of control over the defendants to support a Section 1 claim. Having answered that question in the negative, we take no view as to whether any additional factors might independently preclude the maintenance of an action under the statute.

## B.  The Puerto Rico Antitrust Claims.

The plaintiffs recast their Sherman Act claims as separate causes of action under Puerto Rico's antitrust law, 10 P.R. Laws Ann. § 258.  That statute prohibits "[e]very contract, combination . . . or conspiracy in unreasonable restraint of trade or commerce in the Commonwealth of Puerto Rico."  Id.  Because this language mirrors the language of Section 1 of the Sherman Act, we have treated the two provisions as coextensive.  See Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft, 19 F.3d 745, 754 (1st Cir. 1994); see also Pressure Vessels v. Empire Gas, 137 P.R. Dec. 497, 508-20 (1994), 37 Offic. Trans. ___, ___ [Slip Op. Offic. Trans. at 8-20] (examining Puerto Rico's antitrust statute and articulating its equivalency to federal law).  Hence, we apply the reasoning elucidated above and affirm the district court's entry of summary judgment for the defendants on these claims.

## C.  **The Plaintiffs' Alternative Antitrust Theories**.

The plaintiffs next contend that they presented three alternative antitrust theories before the district court, namely, (1) that the physician members of the defendants' boards were part of an anticompetitive conspiracy that included non-physician board members; (2) that there was a conspiracy among physicians who influenced, though they did not control, the defendants and their policies; and (3) that the defendants were parties to an anticompetitive conspiracy among community-based medical doctors who compete with podiatrists.  These theories are viable, the plaintiffs say, notwithstanding the absence of physician control vis-à-vis the defendants.  Consequently, the district court erred in granting summary judgment on the antitrust claims.

To put these nascent claims into perspective, we examine the record below.  None of these additional theories is readily apparent from a thoughtful reading of the amended complaint, and neither Triple-S nor Blue Cross addressed them in their initial summary judgment memoranda.  The plaintiffs sought to widen the playing field by mentioning the additional theories in their oppositions to the defendants' motions. Triple-S disregarded these allusions.  Blue Cross, however, argued in a reply brief that none of the three alternative theories, as stated, articulated a claim upon which relief could be granted, and that, in all events, the evidence did not support any of them.

In allowing Blue Cross's motion for summary judgment, the district court deemed these alternative theories to be within the umbrella of the plaintiffs' "structural conspiracy" claim. The court did, however, entertain the possibility that the third theory amounted to a separate claim but ruled that the plaintiffs' failure to provide any semblance of detail doomed it. The court handled the matter differently in regard to Triple-S. Because that defendant, unlike Blue Cross, had not responded to the plaintiffs' belated exposition, the district court allowed the alternative theories to survive as against Triple-S. The plaintiffs later stipulated to dismissal without prejudice of the residuum of these claims vis-à-vis Triple-S. We must deal, therefore, only with the three alternative theories as they affect Blue Cross.

This motley need not detain us long. The first alternative theory suggests the existence of a physician-dominated conspiracy that included non-physicians (and, thus, constituted a majority of the Blue Cross board sufficient to exercise control). But this theory is not anchored in the record. The plaintiffs have neither identified a single non-physician participant in this alleged cabal nor otherwise furnished even a scintilla of evidentiary detail. Because the claim relies solely on unsupported conjecture, it cannot withstand summary judgment. See Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

-22-

The plaintiffs' second alternative theory suggests that a minority coalition of physicians unduly influenced the formulation of Blue Cross's benefits packages. That claim is factually unsupported, and we swiftly discard it based on the logic previously articulated. See supra Part II(A)(2).

The third alternative theory, like the first two, is a barebones allegation wrapped in the gossamer strands of speculation and surmise. The plaintiffs have neither identified a single physician outside Blue Cross who is part of the alleged conspiracy nor pinpointed any agreement with such a physician that might violate Section 1. Because this theory lacks evidentiary support, it was not a barrier to the entry of summary judgment.

The plaintiffs attempt to confess and avoid. They blame the dearth of evidence on a denial of discovery and complain that summary judgment was premature because they had insufficient opportunity to flesh out these alternative theories and pursue supporting evidence through discovery. A careful perscrutation of the record belies this plaint. The district court's discovery order embraced any and all antitrust theories including, by definition, the embedded formulations that the plaintiffs belatedly found lurking in the penumbra of the amended complaint. We explain briefly.

Blue Cross's motion for brevis disposition broadly requested the entry of summary judgment on the "[p]laintiffs'

claims under Section 1 of the Sherman Act and Article 2 of Puerto Rico's antitrust statute." Blue Cross did not limit this prayer to any particular antitrust theory, but, rather, sought to scotch the antitrust claims as a whole. The district court's ensuing order matched the scope of Blue Cross's motion; it permitted discovery, without limitation, as "to the issues raised in [Blue Cross's] motion for summary judgment on the antitrust claims." Consequently, to the extent that the amended complaint raised alternative theories of antitrust liability, the plaintiffs had adequate opportunity to discover facts in support of them. They cannot now complain that the lack of evidence in the record should be excused. See Maldonado-Denis v. Castillo-Rodriquez, 23 F.3d 576, 585 (1st Cir. 1994).

We add one final note. Had the plaintiffs genuinely believed that they had been unfairly limited in the availability of discovery, they had an obligation to bring the matter to the district court's attention by means of a timely motion under Fed. R. Civ. P. 56(f). See Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 44-45 n.15 (1st Cir. 1998); Resolution Trust Corp. v. N. Bridge Assocs., Inc., 22 F.3d 1198, 1203 (1st Cir. 1994). In the absence of such a motion — and none was filed here — a subsequent complaint of denied discovery will ordinarily be rejected. See, e.g., Corrada Betances v. Sea-Land Serv., Inc.,

248 F.3d 40, 44 (1st Cir. 2001); Mass. Sch. of Law, 142 F.3d at 44. This case falls well within that general proscription.

### D. **The Lanham Act Claim**.

In pertinent part, Section 43 of the Lanham Act prohibits the use of any communication "in commercial advertising or promotion [that] misrepresents the nature, characteristics, qualities, or geographic origin of . . . goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B). The plaintiffs assert in their amended complaint that Blue Cross violated this statute when it "falsely disparaged the health care services provided by podiatrists and actively encouraged patients to seek services from medical doctors instead." Beyond this statement, the plaintiffs make only the skimpy allegations that "patients have falsely been told by [Blue Cross] that [it] cannot reimburse them for podiatrist services because podiatrists are not 'real' doctors," and that these misrepresentations were "disseminated widely to patients who needed foot care." The amended complaint contained no allegation or information regarding the means through which these misrepresentations were communicated. Blue Cross moved under Fed. R. Civ. P. 12(b)(6) to dismiss this claim, and the district court obliged.

We afford plenary review to a district court's order of dismissal for failure to state a claim upon which relief can be granted. Arruda v. Sears, Roebuck & Co., 310 F.3d 13, 18 (1st Cir.

-25-

2002). In conducting that review, we must assume the truth of all well-pleaded facts contained in the operative pleading (here, the plaintiffs' amended complaint). Id. If "the factual averments do not justify recovery on some theory adumbrated in the complaint, then — and only then — can we affirm a dismissal for failure to state an actionable claim." Rogan v. Menino, 175 F.3d 75, 77 (1st Cir. 1999).

Despite this generous standard, we repeatedly have cautioned that "Rule 12(b)(6) is not entirely a toothless tiger. . . . The threshold for stating a claim may be low, but it is real." Dartmouth Rev. v. Dartmouth Coll., 889 F.2d 13, 16 (1st Cir. 1989) (internal citation omitted). The complaint must therefore set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988); see also DM Research, Inc. v. Coll. of Am. Pathologists, 170 F.3d 53, 55 (1st Cir. 1999) (explaining that the complaint must "allege a factual predicate concrete enough to warrant further proceedings").

Against this backdrop, we turn to the plaintiffs' Lanham Act claim. The relevant statutory language prohibits misrepresentations only in "commercial advertising or promotion." This is a crucial limitation — and one that the district court thought dispositive here. Accordingly, we must plot the boundaries

of that phrase and then determine whether the plaintiffs' allegations fall within those boundaries.

The courts have developed a four-part test to ascertain which representations fall into the category of "commercial advertising or promotion" for purposes of Section 43(a)(1)(B). The test requires that a representation must (a) constitute commercial speech (b) made with the intent of influencing potential customers to purchase the speaker's goods or services (c) by a speaker who is a competitor of the plaintiff in some line of trade or commerce and (d) disseminated to the consuming public in such a way as to constitute "advertising" or "promotion." See Proctor & Gamble Co. v. Haugen, 222 F.3d 1262, 1273-74 (10th Cir. 2000); Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co., 173 F.3d 725, 735 (9th Cir. 1999); Seven-Up Co. v. Coca-Cola Co., 86 F.3d 1379, 1384 (5th Cir. 1996); Gordon & Breach Sci. Publishers v. Am. Inst. of Physics, 859 F. Supp. 1521, 1536 (S.D.N.Y. 1994).[3]

While the Lanham Act's commercial disparagement provision covers more than classic advertising campaigns, it is nonetheless

---

[3]Although this test bears the imprimatur of several respected courts, the Seventh Circuit has expressed "serious doubts about the wisdom of displacing the statutory text in favor of a judicial rewrite with no roots in the language Congress enacted . . . for when the Lanham Act was adopted there were no constitutional limits on the regulation of commercial speech." First Health Group Corp. v. BCE Emergis Corp., 269 F.3d 800, 803 (7th Cir. 2001). Since the phrase "commercial advertising or promotion" appears in the text of the statute itself and all the courts agree on its approximate scope, we need not resolve that tension here.

aimed at specific forms of communication.  See, e.g., First Health Group Corp. v. BCE Emergis Corp., 269 F.3d 800, 803-04 (7th Cir. 2001); Seven-Up, 86 F.3d at 1384; Gordon & Breach, 859 F. Supp. at 1534-35.  To constitute advertising or promotion, commercial speech must at a bare minimum target a class or category of purchasers or potential purchasers, not merely particular individuals.  See Seven-Up, 86 F.3d at 1384-86 (collecting cases); see also First Health, 269 F.3d at 803 ("Advertising is a form of promotion to anonymous recipients, as distinguished from face-to-face communication."); 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 27:102 (4th ed. 2003) ("A cause of action for commercial disparagement requires that the disparaging statement about another's product be published . . . .").  Thus, to pass the pleading threshold in a Lanham Act § 43(a)(1)(B) case, a plaintiff at the very least must identify some medium or means through which the defendant disseminated information to a particular class of consumers.  See Ultra-Temp Corp. v. Advanced Vacuum Sys., Inc., 27 F. Supp. 2d. 86, 91 (D. Mass. 1998); see also 4 McCarthy, supra, § 27:24 (noting that identifying a false or misleading statement that was made in "commercial advertising or promotion" is a pleading requirement for a product disparagement claim).  The plaintiffs' allegations here lack this critical component; they do not implicate the use of any particular advertising or promotional

medium.  This omission opened the Lanham Act count to dismissal under Rule 12(b)(6).  See Gooley, 851 F.2d at 515.

The plaintiffs, in their appellate brief, belatedly endeavor to plug this hole.  They claim for the first time that "[w]hen prospective patients contact [Blue Cross] inquiring about foot care," Blue Cross representatives habitually "disparag[e] podiatrists as not being 'real doctors.'"  We need not decide whether this method of responsive communication would fall under the rubric of "commercial advertising or promotion" within the meaning of the Lanham Act or whether such a statement, if articulated in the amended complaint, would have satisfied the pleading requirements.  It is elementary that a plaintiff cannot constructively amend his complaint with an allegation made for the first time in an appellate brief.  Royal Bus. Group, Inc. v. Realist, Inc., 933 F.2d 1056, 1066 (1st Cir. 1991); Dartmouth Rev., 889 F.2d at 22.  Thus, the argument has been waived.  McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 22 (1st Cir. 1991) ("It is hornbook law that theories not raised squarely in the district court cannot be surfaced for the first time on appeal."); Clauson v. Smith, 823 F.2d 660, 666 (1st Cir. 1987) (similar; collecting cases).

## III.  CONCLUSION

We need go no further.  Suffice it to say that close scrutiny of the record reveals that the district court

appropriately granted the defendants' dispositive motions on both the antitrust and commercial disparagement claims.  The plaintiffs may have a remedy in the marketplace, the Puerto Rico legislature, or the local courts, but for aught that appears they do not have one in the domain of the federal judiciary.

**Affirmed**.